IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL LEITERMAN,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>JEH JOHNSON, *et al.*,<br><br>　　　　　Defendants. | Civil Action No.: 1:13-cv-00394-RDM |

### CORRECTED PLAINTIFF'S INITIAL EXPERT DISCLOSURE

Plaintiff, pursuant to Fed. R. Civ. P. 26(A)(4), makes the following disclosure:

Sharron Rush may testify at the trial of this case as an expert pursuant to Fed. R. Ev. 702-705. A report that summarizes her opinions and the bases for those opinions is attached. A copy of the agreement providing the terms and amount of compensation for Ms. Rush is attached, as is her CV. In addition to the documents specifically cited in her report, Ms. Rush was provided with the following bates numbered documents produced by the Defendant: 0856-1017; 0829-0855; 0821-0828; 0330-0401; 1796-1883; 1194-1795; 1142-1193; 1081-1141; and 1018-1078. Additionally, she reviewed the Memorandum Opinion in this case. Ms. Rush will provide a video supplement to her Report next week. The cost for the initial report is approximately $2,100.00.



EXHIBIT
A
CA 13-394 RDM

Plaintiff reserves the right to supplement his Initial Designation and report.

/s/ Joseph B. Espo
Joseph B. Espo, D.C. Bar No. 429699
Laura Ginsberg Abelson
BROWN, GOLDSTEIN & LEVY LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
jbe@browngold.com
labelson@browngold.com
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MICHAEL LEITERMAN, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No.: 1:13-cv-00394-CKK |
| JEH JOHNSON, *et al.*, | : | |
| Defendant. | : | |

**PLAINTIFF'S INITIAL EXPERT DISCLOSURE**

Plaintiff, pursuant to Fed. R. Civ. P. 26(A)(4), makes the following disclosure:

Sharron Rush may testify at the trial of this case as an expert pursuant to Fed. R. Ev. 702-705. A report that summarizes her opinions and the bases for those opinions is attached. A copy of the agreement providing the terms and amount of compensation for Ms. Rush is attached, as is her CV. In addition to the documents specifically cited in her report, Ms. Rush was provided with the following bates numbered documents produced by the Defendant: 0856-1017; 0829-0855; 0821-0828; 0330-0401; 1796-1883; 1194-1795; 1142-1193; 1081-1141; and 1018-1078. Additionally, she reviewed the Memorandum Opinion in this case. Ms. Hicks will provide a video supplement to her Report next week. The cost for the initial report is approximately $2,100.00.

Plaintiff reserves the right to supplement his Initial Designation and report.

/s/ Joseph B. Espo
Joseph B. Espo, D.C. Bar No. 429699
Laura Ginsberg Abelson
BROWN, GOLDSTEIN & LEVY LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
jbe@browngold.com
labelson@browngold.com
*Attorneys for Plaintiff*

# Digital Accessibility

Information provided by Sharron Rush, author, web accessibility expert

Introduction

The following is an explanation of digital accessibility, what it is, why it matters, and how it is a design consideration that produces equal access to information and communication technologies for people with various disabilities. In addition, this document presents an examination of the consequences of inaccessibility in general and specifically in the case of Leiterman vs DHS. In preparing this report, the author reviewed numerous court documents and records from the investigation that followed discrimination complaints brought by Michael Leiterman against his employer, the United States Department of Homeland Security (DHS). A review of these records and her own deep experience in digital technology accessibility leads the author to conclude that the claim of discrimination is supported by all of the evidence, including the Section 508 compliance reports issued by the agency's own Office of Accessible Systems & Technology (OAST).

Background

The Americans with Disabilities Act (ADA) prohibits discrimination against people with disabilities in employment, transportation, public accommodation, and communications. The ADA ensures physical access to public places and although digital access is not explicitly referenced in the law, the Department of Justice has recently taken the position that Title III also applies to websites as part of "public accommodation." The ADA was based in part on earlier provisions enacted under the Federal Rehabilitation Act. The Rehabilitation Act prohibits discrimination on the basis of disability in programs conducted by Federal agencies, in programs receiving Federal assistance, in Federal employment, and in the employment practices of Federal contractors. Several sections of this act involve digital accessibility including Section 503, Section 504, and the most widely familiar Section 508.

Section 503

- Required: All contracts entered into by the US Federal Government require the contractor to take affirmative action to employ, and advance in employment, individuals with disabilities.
- Applies to: Any prime contract or sub-contract over $10,000 in value.
- Enforcement is both active – with regularly scheduled compliance audits and accessible procurement practices – and reactive based on complaints from individuals with disabilities.
- Conclusion: Digital job applications and all internal information technology used by employees of any employer who wishes to do business with the government must meet defined and mandated accessibility standards (or an equally effective alternative must be provided.)

Section 504

- Required: No otherwise qualified individual with a disability in the United States can be excluded from participation in any program or activity receiving Federal financial assistance. Discrimination in the treatment of such individuals is expressly prohibited.
- Applies to: Any program or activity receiving Federal financial assistance, including the federal agencies themselves, which are wholly funded by federal funds.
- Conclusion: Federal agencies must provide employees with accessible digital tools to facilitate equal participation and avoid job discrimination.

Section 508
- As most recently amended, Section 508 provides the blueprint of just what is intended in Section 504.
- Conclusion: While Section 504 provides the context of the law, it is Section 508 that provides the explicit, measurable standard to determine if requirements of information and communications technology accessibility are being met.

CVAA
- 21st Century Communications and Video Accessibility Act was enacted in 2010 and updates federal communications law to make explicit the requirement for equal access to modern communications technology for persons with disabilities. The CVAA modernizes accessibility laws enacted in the 1980s and 1990s, bringing them up to date with 21st century technologies, including new digital, broadband, and mobile innovations.

The intent of this series of legislative actions is clearly to ensure that people with disabilities are provided with equal access to information and communication technologies that are foundational for equal participation in modern society. People with disabilities can only achieve equity in opportunities for education, employment, and job security and advancement when they are provided with equal access to the digital information and communication tools that are so widely used by others.

## Designing for Accessibility

Many people with disabilities rely on "assistive technologies" to bridge the functional gap created by the interaction of their disability with their environment. The US Federal Government defines assistive technology as "any item, piece of equipment, or product system, whether acquired commercially, modified, or customized, that is used to increase, maintain, or improve functional capabilities of individuals with disabilities." In creating the modern built environment, buildings, parks, and other public spaces are designed to allow access and freedom of movement for assistive technologies like wheelchairs, walkers, canes, scooters, crutches and such. Braille is placed in elevators and on office signs to meet the needs of blind patrons. It has become standard design practice and no architect could practice without understanding how to meet these diverse access needs.

Computer-based assistive technologies similarly provide a way for people with disabilities to navigate through the digital environment. Just as architects of the built environment must consider the complex physical interaction of assistive technologies with the space – the width of doors and pathways, the slant of ramps, the ability of doors to open automatically, varied modes of signage to communicate directions for deaf, blind and cognitively impaired patrons, etc – digital architects should be making similar considerations. Creators of information technology platforms must consider complex interactions of hardware, software, programming languages, and digital rendering devices in order to provide access for the broadest possible range of individual needs. Just as there are architectural standards for accessible buildings, there are global standards that define accessible information and communications technology. These are the standards of the World Wide Web Consortium's (W3C) Web Accessibility Initiative (WAI), the standards that were adapted as the basis for the US Section 508 Guidelines previously mentioned.

Successful digital accessibility depends on the alignment of accessible content, the software the renders the content, and the platforms that author the content. Thus there are three sets of standards that apply to digital accessibility:

Web Content Accessibility Guidelines (WCAG)
> The most current version, WCAG 2.0 was published as an official W3C Recommendation in 2008 and is a stable technical standard referenced by governments throughout the world. It has 12 guidelines that are organized under 4 principles: perceivable, operable, understandable, and robust. For each guideline, there are testable success criteria, which are at three levels: A, AA, and AAA.

User Agent Accessibility Guidelines (UAAG)
> The User Agent Accessibility Guidelines (UAAG) documents include technical specifications that define how to make user agents accessible to people with disabilities, particularly to increase accessibility to web content. User agents include browsers, media players, and assistive technologies, the software that some people with disabilities use to interact with computers.

Authoring Tool Accessibility Guidelines (ATAG)
> Authoring tools are software and services that web developers, designers, and content providers use to produce web content that may include static web pages, dynamic web applications, and digital information management for a company's internal purposes. ATAG provides guidelines to both make the authoring tools themselves accessible and usable by people with disabilities and help authors create content that conforms to WCAG.

For more than 10 years, these standards have been in place to provide guidance to those who develop software, write content for the web, create communication platforms, or otherwise participate in the provision of electronic information technology (EIT). They were created through a consensual process that encourages participation and collaboration from the IT industry as well as government, academic, and advocacy organizations. Working together, these standards create the shared understanding that is needed to provide accessible environments for assistive technologies. Ten years is a very long time in terms of software lifecycles. And yet digital communications systems continue to fail people for whom it could be most useful - people with disabilities. If designed with accessibility in mind, modern technology could provide unprecedented opportunity for people with disabilities to succeed and to be more productive and independent citizens. It is the inaccessible environment that creates a disabling condition when society has the tools for inclusion but fails to employ them.

It is the responsibility of employers, and especially employers who are federal government agencies, to insist that their vendors and internal EIT providers follow global guidelines and provide accessible systems. The technical capacity for creating accessible systems is unquestionable; the specifications for achieving it are clear. It is only lacking the will in enforcement of the standards in development and procurement that keep people with disabilities locked out of equal participation in the global communications revolution.

How Screen Reading Software Works
On a desktop and many laptop computer systems, text is converted to speech by software commonly referred to as a "screen reader." The most widely used in the United States is JAWS by Freedom Scientific. Other popular screen readers include WindowEyes, which is now built into the MicroSoft

3

Office suite of software programs, and NVDA, an open source, free program from an Australian nonprofit group. As well, some browsers have now built an optional screen reading function into their applications. ChromeVox for Chrome and VoiceOver for MacOS are examples of these. The accompanying video demonstrates the use of some of these screen reading applications. Here the focus is on JAWS as the central example as it is the most commonly used.

Like other screen readers, JAWS is transparent to most applications. JAWS converts text information on the device screen into synthetic speech and reads it aloud, going from left to right and top to bottom in the default reading mode. If JAWS comes upon an image in the midst of the text, it relies on the text alternative (often called "alt-text") to make sense of the image content. If no text alternative is provided in a way that can be parsed by the screen reader, JAWS will speak the path and filename – a most unproductive and unpleasant user experience. When a link is encountered, JAWS is programmed to speak the word link, or in some cases, to speak the link text in a changed voice. There is built in capacity in JAWS to distinguish types of links. Link text is preceded by the announcement of the word "link." JAWS will say "this page link" for a named anchor on the current page. A graphic image that links elsewhere, such as an arrow or linked photo, is announced as "graphic link." JAWS prefaces a selectable region of a client side image map with "image map link." If the hotspot is properly assigned a text alternative, the user will know the consequence of activating the link – will know what the link does where it goes. If no alt text has been provided, JAWS will speak the path and file name which we have described previously.

As the web has become more dynamic and increasingly based on scripted programs that modify the user interface in response to user choice, screen readers have evolved as well. There are complex keystrokes and key combinations that allow more sophisticated interactions with properly programmed and labeled modal windows, form inputs, pulldown menus, media controls, and other aspects of the modern web. A person who relies on screen reader access clearly cannot scan content to point and click for the next action. All information and function must be keyboard accessible in an efficient and clearly labeled way that approximates the efficiency afforded to mouse users or touch screens. This kind of universal design for technology was not found in many of the software and hardware systems that Mr. Leiterman was expected to use as a routine part of his job duties.

## DHS Information and Communications Technology Systems
In preparing these comments, the author did not perform tests on the systems in question but reviewed accessibility reports, VPATs, and other documentation of several of the information and communications technology systems that Mr. Leiterman was expected to use in the execution of his job duties. Most of the barriers are clearly stated in the reports and are summarized below.

### Windows XP Standard Customs and Border Protection Client Image
> A client-based virtual machine is an instance of an operating system that is managed centrally on a server and executed locally on a client device. The "client image" is the local method for interaction with the central service. VPAT for Windows operating systems – both XP and Windows 7 – support Section 508 with a few minor, but critical exceptions. Several instances are cited where additional supports could be required depending on the implementation and the Windows version. In this case, the internal review of the CPB client image reported numerous failures of Section 508 requirements, including lack of text alternatives for images,

lack of keyboard control, reading order that did not make sense, and user inputs that were not adequately labeled.

CONCLUSION: A blind user would not be able to navigate within this system to find or interact with program functions. Given this system in which to work, a blind employee would not have access to information and function equivalent to that of sighted employees.

### Windows7 Gold Image

Another platform provided to Mr. Leiterman and tested internally was the Windows 7 Gold Image (6.1.0), deployed to pilot production workstations at CBP. The report found numerous violations of Section 508 requirements. In fact, there were few instances where requirements were met. The application failed nearly all standards for basic accessibility.

CONCLUSION: A blind user would not be able to navigate within this system to find or interact with program functions. Given this system in which to work, a blind employee would not have access to information and function that is equivalent to that of sighted employees.

### FedTraveler

FedTraveler.com is the website used to book travel and make hotel arrangements for business conducted by CBP employees. It did not meet Section 508 accessibility standards.

CONCLUSION: A blind user would not be able to independently make travel and accommodation arrangements and would be subject to the schedule of someone who could provide sighted assistance. The need to continually ask for assistance is a demeaning position and should not be required.

### Mobikey

MobiKey is a remote-access device which permits telecommuters within CBP to securely access their workstation from any computer outside the CBP network. The system consists of a read-only USB thumb drive in combination with connection and configuration software which provides connectivity to a workstation using mirror-driver technology. The report found that the system "affectively bars blind users from utilizing ...core functionality..."and cited a "screen reader's inability to access MobiKey's video channel or mirror driver." Thus none of the information or function of the remote workstation was in fact available to a blind employee.

CONCLUSION: This is not a working accommodation. It is inconceivable that a non-sighted employee could be productive in this environment.

### Key fob for MobiKey

In addition to the inherent inaccessibility of the interaction and information retrieval, basic access to the remote system itself depends on a security key fob that flashes numbers in a changing sequence. Users are is allowed access only when they identify the correct sequence. Since this system relies on sighted access exclusively, it is entirely inaccessible to a blind employee.

CONCLUSION: Not only does the system itself lack functional interactivity for a blind user, there is effectively no way to even enter the system to begin with. This is not an equal accommodation.

### Miscellaneous software and communications systems:

In addition to those previously mentioned, there were additional accessibility tests performed on standard word processing programs and documents, including MS Word,

5

Adobe PDF. PowerPoint and others. The majority of those in these reports failed to meet Section 508 requirements.

CONCLUSION:

A blind employee would be denied access to basic information needed to be efficient and productive in the performance of his duties.

I have not testified as an expert in the past four years.

Date: December 17, 2014                              Sharron Rush



Knowbility, Inc.
3925 W. Braker Lane, 3rd Floor
Austin, TX 78759-5316
512-305-0310

November 7, 2014

Laura Ginsburg Abelson, Associate
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD 21202

Dear Ms. Ginsburg Abelson:

Thank you for inquiring about Knowbility's accessibility services. We are pleased to present this proposal in response to your request for **Accessible IT services**. Knowbility is recognized for leadership in accessibility and we believe we can provide you with excellent services.

**Statement of Work**

Knowbility will provide the following accessibility services that may include, but are not limited to, the following tasks:

1. Assess digital tools used to perform standard job tasks
2. Determine if the digital tools themselves are accessible according to the 508 and other relevant standards
3. If the digital tools are not natively accessible, determine if alternatives provided are "equivalent" as required by law
4. Perform testing and documentation of any online applications needed in performing job related tasks
5. Review any VPATs on file for tools and validate their accuracy
6. Review or assess any other relevant digital accessibility issues or products
7. Determine the feasibility of creating or procuring products that have similar functions but are accessible, for example, the agency training module
8. Provide testimony or report(s) on accessible information technology, subject may include history of, standards, guidelines, best practices, or how accessibility is accomplished
9. Other Advisory services as requested

Knowbility will assess the accessibility of digital tools, software products, applications, and electronic documents in terms of adhering to Section 508, WCAG 2.0 AA and any other relevant accessibility standards. Testing consists of in-depth Expert Manual Review to identify accessibility errors/violations and measure compliance. Knowbility will provide report documents with specific information about errors/violations encountered, along with recommended technical solutions as requested.

**Cost**
Knowbility will bill at the following rates:
$175 per hour for Testing, Assessments, Reviews and other Advisory Services
$200 per hour for Documentation and Reporting

**Accessibility Review/Testing Assumptions**
Delivery and pricing are based on the following assumptions:
- **Time and materials:** This is a time and materials estimate, based upon our current knowledge.
- Travel costs for consultations, if required, will be billed separately. No travel costs are anticipated.
- Auto-testing is not included, though it may be included upon request.
- **Sample size** is an estimate based on external viewing and we are happy to scale up or down based on **Brown, Goldstein & Levy** preference and greater understanding of page types and actual tasks.
- **Test Environment - Test Data:** It is understood and agreed upon that **Brown, Goldstein & Levy** is responsible for ensuring Knowbility tester access to screens/pages to be reviewed, including a stable, uninterrupted test environment, working test data – URLs, login, passwords, test account numbers, test scripts and/or other test data required to perform accessibility and/or

usability testing. Project delays or expenses incurred as a result of an unstable, nonfunctional or inadequate test environment or test data, incomplete, inadequate or nonfunctional test scripts or test protocols are not the responsibility of Knowbility, Inc.

- **Test Environment - Changes:** It is understood and agreed upon that **Brown, Goldstein & Levy** will give advanced notice to Knowbility when changes are made to the test environment, test data, screens/pages to be tested, or when the test environment is inaccessible or unavailable ("down") for maintenance or any other reason.
- **Changes in Scope:** It is understood and agreed that actual scope, such as number of screens/pages to be tested, templates, additional revisions and/or testing (i.e. revisions or testing after one round) may vary from this estimate. Any changes in scope, rates or charges are subject to mutual agreement and an executed amendment to this statement of work. Based on specific information to be acquired or provided by **Brown, Goldstein & Levy** as the project unfolds, charges will be adjusted accordingly using the rates and labor estimates in the table above as the basis. If additional templates, testing, technical or consulting services are added by **Brown, Goldstein & Levy**, charges will be adjusted accordingly using the rates and labor estimates in the table above as the basis.
- **Re-testing:** If requested by **Brown, Goldstein & Levy**, Knowbility will perform **one (1) complete re-test** of the web screens/pages cited in the original audit **for an additional fee of one-half the hourly rate** of Expert Manual Review. If the web screens/pages are found to be free of accessibility errors/violations and no accessibility barriers are present, then Knowbility will, upon customer request, issue a statement of compliance, confirming and validating that no accessibility errors exist in those web screens/pages at the time of re-testing. **After one complete re-test, any further re-testing will be charged at the standard rate of $175 per hour.**

**Payment and Payment Terms**

Knowbility will invoice Brown, Goldstein & Levy for the services described in this Statement of Work within 15 days of completion of the work. Brown, Goldstein & Levy will pay Knowbility the full amount due within 30 days of receipt of the invoice.

If you agree to the scope of work, project deliverables, fees and pricing structure as described in this Statement of Work then please have an authorized officer sign below and this will constitute a contractual agreement.

Each of the representatives signing this Agreement on behalf of the respective parties hereto represents and warrants that he or she has been duly authorized to execute and deliver this Agreement and that upon execution and delivery hereof, this Agreement shall be binding and enforceable in accordance with its terms against such party for whom such representative has signed.

IN WITNESS WHEREOF, the parties to this Agreement have executed it, as of the Effective Date, by their duly authorized officers.

Brown, Goldstein & Levy

Signature: _Joseph B. Espo_ (signed)   Date: 11/17/14

Print Name: Joseph B. Espo

Title: Partner

Knowbility, Inc.

Signature: _Sharron Rush_ (signed)   Date: November 7, 2014

Print Name: Sharron Rush

Title: Executive Director

Thank you for the opportunity to present this proposal. If you have any questions or require further information, please do not hesitate to contact us.

Sharron Rush  
Executive Director  
srush@knowbility.org  
512 305-0310

Ron Hicks  
Business Director  
ronhicks@knowbility.org  
512 305-0312

srush@knowbility.org  **Sharron Rush**  512 305-0310 | 2012



Ms. Rush is the co-founder and Executive Director of Knowbility, a leading authority on web accessibility since 1998. Ms. Rush developed Knowbility programs to raise web accessibility awareness and skills and to provide technical assistance in accessibility and universal design for corporations and institutions seeking to achieve accessibility. Since 2007, she has served as an invited expert to the Education and Outreach Working Group (EOWG) of the Web Accessibility Initiative (WAI) of the W3C. In 2009, she began as liaison from WAI to the e-Government Interest Group developing standards and best practices for using the Web to improve government accountability and transparency.

Ms. Rush has led Knowbility to recognition by the Clinton White House and the US Department of Labor for excellence in employment practices for people with disabilities. She has been invited twice to the West Wing to confer with Kareem Dale, President Obama's Special Advisor on Disability Issues. She is an expert trainer and frequent presenter on web accessibility and accessible design issues at disability and mainstream technology conferences.

## Relevant Employment

1998 – present Knowbility, Executive Director
Cofounder and executive officer. Reports to 10-member Board of Directors. In addition to organizational oversight, strategic direction, and program development, she serves as consultant to organziations that seek to improve their information technology accessibility.

1995 – 1998 Easter Seals of Central Texas Program Development Officer
Conceived, planned, and built new community programs for Easter Seals.

## Advisory Role

2007 – present. Invited Expert, Education and Outreach Working Group, Web Accessibility Initiative fo the World Wide Web Consortium
2002 – present. Program Advsior, SXSW Interactive media Festival, Austin, Texas

## Education

Associate of Science Degree, Computer Science, College of Marin, California. 1981
Bachelor of Science Degree, Environmental Science/Biology . University of Texas at Austin. 1996

## Publications/Presentations

Co-author, with Dr. John Slatin, of *Maximum Accessibility* a definitive web accessibility resource.

## Awards:

- 2011 Special Citation for Excellence; City of Austin Mayor's Committee for People with Disabilities
- 2010 Texas Governor's Award for Volunteerism, July 2010
- 2010 Partnership Award, City of Austin Mayor's Committee For People with Disabilities
- 2010 Employer of the Year, Texas Rehabilitation Association
- Named Community Tech Champion by the U.S. Congressional Black Caucus
- 2004 Featured in articles in Equity online newsletter the Sophist online newsletter
- 2003 TEC Champion Award for Outstanding Technology Leadership, Washington DC-based Education Technology Think Tank and CTCNet
- 2002 Dewey Winburne Community Service Award SXSW Interactive Media Conference
- 2002 Outstanding Community Collaboration, Texas State Legislature, for Knowbility's ATSTAR
- 2001 Community Technology Partnership Award from Capitol Area Training Foundation
- 2001 Named to Top 25 Women of the Web by San Francisco Women of the Web
- 2000 Peter F. Drucker Foundation for Nonprofit Innovation.
- 2000 White House recognition of Rocky Mountain AIR program as an initiative bridging the digital divide
- 2000 National Labor Summit highlights Knowbility's AIR program as a "best practice" in employment of people with disabilities
- 1998 Achievement in Media Award, Austin Mayor's Committee for People with Disabilities

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL LEITERMAN,<br><br>Plaintiff,<br><br>v.<br><br>JEH JOHNSON, *et al.*,<br><br>Defendant. | Civil Action No.: 1:13-cv-00394-CKK |

## NOTICE OF SERVICE

I HEREBY certify that on this 17th day of December, 2014, copies of: Plaintiff's Initial Expert Disclosure and this Notice of Service were delivered by e-mail to:

W. Mark Nebeker, Esquire
Assistant United States Attorney
Civil Division
U.S. Department of Justice
555 Fourth Street, N.W.
Washington, DC 20530
mark.nebeker@usdoj.gov

*Attorneys for Defendant*

                                                /s/
Joseph B. Espo
Laura Ginsberg Abelson
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
jbe@browngold.com
labelson@browngold.com

*Attorneys for Plaintiff*